## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| KELLI ADAMS, on behalf of herself and all others similarly situated, <br><br>                 Plaintiff, <br><br> v. <br><br> GERBER PRODUCTS COMPANY, <br><br>                 Defendant. | **CLASS ACTION COMPLAINT** <br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Kelli Adams ("Plaintiff"), on behalf of herself and all others similarly situated, brings this class action suit for damages and equitable relief against Defendant Gerber Products Company ("Gerber" or "Defendant"). Plaintiff alleges the following based upon personal information as to allegations regarding herself, on the investigation of her counsel, and on information and belief as to all other allegations:

### <u>NATURE OF THE ACTION</u>

1.     Plaintiff brings this class action on behalf of herself and other all other parents and persons nationwide who bought Defendant's baby food products containing harmful heavy metals such as inorganic arsenic, lead, cadmium, and mercury. The products at issue include, but are not limited to, the following: Gerber's Puffs, Lil'Crunchies, Yogurt Melts, 2nd Foods (i.e., carrot, banana, and sweet potato purees), Single Grain Rice Cereal, MultiGrain Cereal, Whole Wheat Whole Grain

Cereal, White Grape Juice, and Arrowroot Biscuits (referred to herein as "Gerber Products").[1]

2.      Numerous scientific studies conducted over the last several decades have confirmed that inorganic arsenic, lead, cadmium, and mercury are developmental neurotoxins that are harmful to a baby's developing brain and nervous system.  There are no established safe levels of these substances for baby foods.

3.      Babies and children who consume inorganic arsenic, lead, cadmium, or mercury are at risk of suffering health problems, a loss of intellectual capacity and behavioral problems such as attention-deficit/hyperactivity disorder ("ADHD"), among other things.  Even the consumption of small amounts over time can increase the risk of bladder, lung and skin cancer, and Type 2 Diabetes. Moreover, medical professionals and scientists alike agree that early exposure to heavy metals can have long-term effects that are irreversible.

4.      On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform issued a detailed report titled, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* ("Congressional Report").  The Congressional Report revealed that some of the largest baby food manufacturers in an industry that generates over $50 billion annually in sales knowingly distributed and sold baby food containing harmful heavy metals such as inorganic arsenic, lead, cadmium, and mercury.  Gerber was identified as one of the companies knowingly selling baby foods containing harmful heavy metals.

5.      Gerber manufactures, warrants, advertises, and sells its products as being suitable and safe for consumption by babies. For example, all the Gerber Product labels have the famous "Gerber Baby" logo, as well as indications that the product is appropriate for crawling or sitting babies. Gerber also claims that its products "meet the standards of the FDA" and that Gerber has "among the strictest standards in the world." In fact, Gerber claims that every jar of their baby food goes "through over 100 quality checks." Gerber's food labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that Gerber products are safe and suitable for consumption by babies.

---

[1] Plaintiff reserves the right to expand the list of Gerber products specifically identified herein as their investigation continues and/or they have had an opportunity to conduct discovery.

6.      As alleged herein, Defendant's marketing and advertising of its products is false, deceptive, and misleading to reasonable consumers because Defendant knows that heavy metals are harmful to babies yet sold products containing harmful heavy metals as evidenced by testing. Defendant's marketing and advertising of its products is also false, deceptive, and misleading to reasonable consumers because Defendant failed to warn and disclose material facts regarding their products, namely, that they were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that testing showed that their products contained harmful heavy metals; and that their internal policies permitted the sale of baby food products with harmful heavy metals. Gerber's distribution and sale of these products was unlawful, unfair, false, and misleading, and Gerber was unjustly enriched at the expense of Plaintiff and Class members.

7.      Plaintiff and Class members would not have purchased the Gerber Products, or would have paid less, had they known that the products were unsafe and unsuitable for babies; that they contained heavy metals or the levels of heavy metals; that Defendant's testing showed that their products contained harmful heavy metals; or that its policies permitted the sale of baby food products with harmful levels of heavy metals.

8.      Plaintiff brings this action and asserts claims on behalf of herself and all other similarly situated persons (defined below) for fraud, deceptive, false, and misleading advertising and business practices, and unjust enrichment.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Class exceeds 100; and many members of the proposed Class are citizens of different states than the Defendant.

10.      This Court has personal jurisdiction over Defendant Gerber Products Company because Defendant regularly sells and markets its products in this District, and Defendant derives substantial revenue from sales of its products in Virginia, with the knowledge that its products are being marketed and sold for use in this State.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant transacts

substantial business in this District and Defendant is headquartered in Arlington, Virginia.

12.     This Court has supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

## THE PARTIES

### Plaintiff

13.     Plaintiff Kelli Adams is a resident and citizen of Florida. Plaintiff has bought Gerber baby foods, including Gerber's Puffs, Yogurt Melts, 2nd Foods purees (Carrot, Banana and Sweet Potato), Single Grain Rice Cereal, and Multigrain Cereal from Publix supermarkets near her home in Saint Augustine, Florida. Plaintiff has regularly purchased these products since 2018 and reviewed and relied on the representations on the packaging and believed the products to be safe and suitable for babies.  Plaintiff Adams' purchases took place during a time in which third-party testing showed that the Gerber products contained harmful heavy metals.  If Plaintiff Adams had known that the products were unsafe and unsuitable for babies; that they contained heavy metals; the levels of the heavy metals; that testing showed that these products contained harmful heavy metals; or that the Defendant's policies permitted the sales of products with harmful levels of heavy metals, Plaintiff Adams would not have purchased the products or would have paid less for them.

### Defendant

14.     Defendant Gerber Products Company is a citizen of Michigan, where it is incorporated, and Virginia because it maintains its principal place of business at 1812 N. Moore St., Arlington, Virginia 22209. Defendant also does business throughout the United States. Defendant's baby food products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

## FACTUAL ALLEGATIONS

### There are No Established Safe Levels of Heavy Metals in Baby Food

15.     According to the U.S. House of Representatives' Congressional Report, "Children's exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior."  The Congressional Report highlights numerous studies conducted over the last several decades analyzing the effects of early

exposure of heavy metals and concluding that the harm is long-standing and irreversible.

16.    Babies are particularly vulnerable to the effects from exposure to heavy metals because they are small, and their organs are developing.  Specifically, exposure to heavy metals during a baby's developmental stage can lead to "'untreatable and frequently permanent' brain damage, which may result in 'reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior.'"[2]  According to Tom Neltner, chemical policy director for the Environmental Defense Fund ("EDF") which has studied lead in food for 25 years, "Exposure to these toxic heavy metals affects babies' brain development and nervous system, it affects their behavior, permanently decreases IQ, and, if you want to boil it down to dollars, their lifetime earnings potential."

17.    A published study titled, *A Strategy for Comparing the Contributions of Environmental Chemicals and Other Risk Factors to Neurodevelopment of Children*, found that exposure to heavy metals such as lead are "associated with 40,131,518 total IQ point loss in 25.5 million children (or roughly 1.57 lost IQ points per child)—more than the total IQ losses associated with preterm birth (34,031,025), brain tumors (37,288) and traumatic brain injury (5,827,300) combined."[3]

18.    The Food and Drug Administration ("FDA") has concluded that inorganic arsenic, lead, cadmium, and mercury are hazardous to babies and children and have "no established health benefit" and "lead to illness, impairment, and in high doses, death."  Further, even low levels of these heavy metals are concerning to health and well-being.

**Inorganic Arsenic**

19.    The consumption of arsenic can result in serious and life-threatening health problems. The Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") has ranked arsenic as the number one substance present in the environment that poses the most significant threat to human health.  The known health risks resulting from arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive

---

[2] Congressional Report at page 9.

[3] *Id.*

development in children."[4]

20.    There is no established safe level of inorganic arsenic for baby foods.  Consumer advocacy groups like Healthy Babies Bright Futures has advocated that there should be no measurable amount of inorganic arsenic in baby food, while Consumer Reports has advocated for a limit of 3 parts per billion ("ppb").

21.    For bottled water, the FDA has set a maximum level of arsenic at 10 ppb, while the Environmental Protection Agency ("EPA") and the World Health Organization ("WHO") have set a similar limit for drinking water.

22.    Several studies have found that arsenic has a significant negative effect on neurodevelopment in children, primarily in IQ levels.  For example, a study of schoolchildren in Maine who drank water with an arsenic concentration level of more than 5 ppb showed significant decreases in "Full Scale IQ, Working Memory, Perceptional Reasoning and Verbal Comprehension scores."[5]

23.    Another study of children in Spain concluded that an increase in arsenic exposure resulted in a reduction of a child's global, gross, and fine motor function scores, and that boys were more susceptible to the neurotoxicity of arsenic.[6]

**Lead**

24.    According to the FDA, lead has no established health benefit.  Lead is the second substance, after arsenic, on the ATSDR's list of substances present in the environment potentially posing a significant threat to human health.  The consumption of low levels of lead from food and other sources has been found to contribute to 400,000 deaths every year.

25.    The Environmental Protection Agency ("EPA"), the Centers for Disease Control and

---

[4] Miguel Rodriguez-Barranco, et al. *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioral Disorders in Children: A Systematic Review and Met-Analysis* (June 1, 2013) (https://pubmed.ncbi.nlm.nih.gov/23570911) (last visited Feb. 10, 2021).

[5] Gail A. Wasserman, et al., *A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren* (Apr. 1, 2014) (https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23) (last visited Feb. 11, 2021).

[6] Antonio J. Signes-Pastor, et al., *Inorganic Arsenic Exposure and Neuropsychological Development of Children of 4-5 Years of Age Living in Spain* (Apr. 29, 2019) (www.ncbi.nlm.nih.gov/pmc/articles/PMC6541502/) (last visited Feb. 11, 2021).

Prevention ("CDC") and the American Academy of Pediatrics ("AAP") unanimously agree that there is no established "safe level of lead (Pb) in a child's blood; even low levels of Pb in the blood can result in behavior and learning problems, lower IQ and hyperactivity, slowed growth, hearing problems, and anemia."[7] Consistent with this assessment, the AAP and the Environmental Defense Fund have proposed a maximum of 1 ppb of lead in food for babies and children.

26.     The FDA has established a maximum daily intake of lead from food (called the Interim Reference Level) of 3 µg (or 3 ppb) for kids and 12.5 µg (or 12.5 ppb) for women of childbearing age. The consumer organization Healthy Babies Bright Future has advocated for a standard of zero lead in baby food while Consumer Reports advocates for no more than 1 ppb of lead in foods and drinks for babies and children.

27.     Outside the food context, the FDA has set a maximum limit on lead of 5 ppb for bottled water.  The EPA has set an action level of 15 ppb of lead for drinking water while the WHO has set 10 ppb as a provisional guideline.

28.     Studies have shown that even low levels of lead exposure can have a negative impact on children.  In two different studies of schoolchildren in Detroit and Chicago public schools, a significant inverse relationship was found between lead exposure and test scores.  The Detroit study, in particular, found a strong correlation between early childhood lead exposure and reduced standardized test performance.[8]  In the Chicago study, higher blood level concentrations were linked to lower reading and math scores in third-grade children, with a substantial 32% increase in failing reading and math.[9]

29.     Early childhood lead exposure can result in permanent cognitive effects, as one study showed.  In that study, adults who had developmental delays associated with lead exposure continued

---

[7] Valerie Zartarian, et al., *Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making* (Sept. 12, 2017) (https://ehp.niehs.nih.gov/doi/10.1289/ehp1605) (last visited Feb. 11, 2021).

[8] Nanhua Zhang, et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence From Detroit Public Schools* (Mar. 2013) (https://pubmed.ncbi.nlm.nih.gov/23327265/) (last visited Feb. 11, 2021).

[9] Anne Evens, et al., *The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools: A Population-Based Retrospective Cohort Study* (Apr. 7, 2015) (https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9) (last visited Feb. 11, 2021).

to show cognitive deficits.[10]

30. Several studies have also established a strong link between lead exposure and ADHD.[11]

31. Jay Schneider, Ph.D., a professor of anatomy, pathology, and cell biology at Thomas Jefferson University in Philadelphia, has examined hundreds of children with lead exposure and believes that even the tiniest amounts of lead in children's food should be avoided.

### Cadmium

32. The ATSDR identifies cadmium as number seven on its list of substances present in the environment that potentially poses a significant threat to human health. Cadmium, like inorganic arsenic, has been shown to affect a child's IQ level and the development of ADHD.

33. Several federal and state agencies have regulated cadmium. Pursuant to Proposition 65, California has identified cadmium as causing developmental and male reproductive toxicity and has set an oral Maximum Allowable Dose Level ("MADL") of 4.1 μg (or 4.1 ppb) per day.

34. The FDA and EPA have set a maximum allowable limit of cadmium of 5 ppb in bottled water and drinking water. The World Health Organization ("WHO") has set a maximum allowable limit of cadmium in drinking water at 3 ppb.

35. Consumer groups have advocated for even stricter levels of cadmium in foods. For example, Healthy Babies Bright Futures has advocated that no measurable amount of cadmium should be in baby foods, while Consumer Reports has advocated for a limit of 1 ppb of cadmium in fruit juices.

36. A study examining the effect of cadmium exposure on children concluded that it negatively impacted Full Scale IQ and in particular, boys. According to the 2018 study, boys "exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less

---

[10] Maitreyi Mazumdar, et al., *Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function: A Follow-Up Study* (Mar. 30, 2011) (www.ncbi.nlm.nih.gov/pmc/articles/PMC3072933/) (last visited Feb. 11, 2021).

[11] Gabriele Donzelli, et al., *The Association Between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review* (Jan. 29, 2019) (www.mdpi.com/1660-4601/16/3/382/htm).

cadmium exposure."[12]

37.     Another 2018 study found a link between cadmium exposure and ADHD and concluded that ADHD was more prevalent among children with the high cadmium exposure as compared to the control group.[13]

### Mercury

38.     Mercury is the number three substance on ATSDR's list of substances in the environment potentially posing a significant threat to human health.

39.     As with inorganic arsenic, lead, and cadmium, Healthy Babies Bright Futures advocates for a goal of zero levels of mercury in baby food.  Outside the baby food context, the FDA has set a limit of 2 ppb of mercury in bottled water, while the EPA has set a limit of 2 ppb for drinking water.

40.     Mercury's effect on children's development has been studied in the context of a pregnant woman's exposure to mercury.  Pre-natal "mercury exposure has been consistently associated with adverse subsequent neuro-development."[14]

### <u>THE GERBER PRODUCTS</u>

### <u>Gerber Represented that the Gerber Products are Safe and Suitable for Babies</u>

41.     Gerber manufacturers, distributes, and sells food for babies and offers of a wide variety of food products such as traditional baby food purees, baby cereals, puffs, and rice cakes.  To gain the trust of the consuming public, Gerber holds itself out as company that cares about the health of babies and kids and the foods they eat. According to its website at www.gerber.com, "100% of our products meet all FDA requirements." Gerber claims to do "[o]ver 100 quality checks in every jar" throughout "5 different stages of safety and quality checks from farm to spoon," and promises that "[t]he health and safety of your little one has been and will always be our highest priority."

---

[12] Congressional Report at 12 (citing Klara Gustin, et al., *Cadmium Exposure and Cognitive Abilities and Behavior at 10 Years of Age: A Prospective Cohort Study* (Apr. 2018) (https://pubmed.ncbi.nlm.nih.gov/29459184/) (last visited Feb. 11, 2021).

[13] Min-Jing Lee, et al., *Heavy Metals' Effects on Susceptibility to Attention-Deficit/Hyperactivity Disorder: Implication of Lead, Cadmium, and Antimony* (June 10, 2018) (https://pubmed.ncbi.nlm.nih.gov/29890770/) (last visited Feb. 11, 2021).

[14] Margaret R. Karagas, et al., *Evidence on the Human Health Effects of Low-Level Methylmercury Exposure* (June 1, 2012) (https://pubmed.ncbi.nlm.nih.gov/22275730/) (last visited Feb. 11, 2021).

42.     Defendant uniformly markets, advertises, represents, and warrants that its products are safe and suitable for consumption by babies.  Every label of a Gerber product features the famous "Gerber Baby" that the company is known for.

43.     The Gerber Puffs label also clearly depicts a crawling baby and indicates that the puffs are intended for "Crawler" babies, age 8+ months.   Defendant also markets its Puffs as supporting "brain development and learning ability." Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Gerber Puffs are safe and suitable for consumption by babies.

44.     The Gerber Puffs are sold in several flavors: Strawberry Apple, Banana, Blueberry, Sweet Potato, Vanilla, Apple Cinnamon, Peach, Organic Cranberry Orange, Organic Fig Berry, and Organic Apple Puffs.

45.     Below is an example of the front label of the Gerber Puffs product:



46.     Regarding the Gerber Lil'Crunchies, on the front of the label is the famous "Gerber Baby," as well as a clear depiction of a crawling baby and indicates that the Lil'Crunchies are intended for "Crawler" babies, age 8+ months. The packaging also touts the fact that the Lil'Crunchies are "Baked with Whole Grains."  The Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Lil'Crunchies are safe and suitable for consumption by babies.   The Gerber Lil'Crunchies are sold in several flavors, including: Mild Cheddar, Veggie Dip, Garden Tomato, Apple Sweet Potato, Ranch, Vanilla Maple, Organic White Cheddar Broccoli, and Organic White Bean Hummus.

47.     Below are examples of the front labels of the Gerber Lil'Crunchies product:



48.     Gerber's Yogurt Melts products also depict the famous "Gerber Baby," as well as a depiction of a crawling baby and indicates that the Gerber Yogurt Melts are intended for "Crawler" babies, age 8+ months. The packaging also touts the fact that the Gerber Yogurt Melts are "made with real fruit." The Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Yogurt Melts are safe and suitable for consumption

by babies.   The Gerber Yogurt Melts are sold in several flavors, including: Strawberry, Very Berry

Blend, Truly Tropical Blend, Mixed Berries, Banana Vanilla, Peach, Organic Banana Strawberry, and

Organic Red Berries.

49.     Below are examples of the front labels of the Gerber Yogurt Melts product:



50.     Gerber's 2nd Foods are purees that also depict the famous "Gerber Baby," as well as a

depiction of a sitting baby and indicates that the 2nd Foods are intended for "Sitter."  Defendant's

statements, taken together and considered as a whole, from the perspective of a reasonable consumer,

convey that the Gerber 2nd Foods are safe and suitable for consumption by babies.   The Gerber 2nd

Foods are sold in several flavors, including: Banana, Sweet Potato, Carrot, Green Bean, Apple, and

Butternut Squash, among others.

51.     Gerber's cereals, such as Single Grain Rice, Multigrain, and Whole Wheat Whole

Grain, also depict the famous "Gerber Baby," as well as a depiction of a baby and indicates that the

product is for "Supported Sitter" babies.  The Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber cereals are safe and suitable for consumption by babies.

52.    Regarding Gerber's White Grape juice, the packaging depicts the famous "Gerber Baby" as well as a depiction of walking baby and indicates that the product is for "Toddler[s]," age 12+months.  Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that Gerber's White Grape juice is safe and suitable for consumption by babies.

53.    Gerber's Arrowroot Biscuits are described as "Baby's First Biscuit" on the front of the package label.  The product depicts the famous "Gerber Baby," as well as a depiction of a crawling baby and indicates that the food is for the "Crawler[s]," age 10+months. Defendant's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that Gerber's Arrowroot Biscuits are safe and suitable for consumption by babies.

### Gerber Knowingly Sold Unsafe, Finished Baby Foods Containing Heavy Metals

54.    In February 2021, the U.S. House of Representatives issued the Congressional Report revealing to the public for the first time that certain companies knowingly sold baby foods containing excessive levels of heavy metals, such as inorganic arsenic, lead, cadmium, and mercury.  The Congressional Report identified Gerber as one of those companies.

55.    According to the Congressional Report, Gerber sold finished baby food products, despite internal testing showing that the products were unsafe because they contained ingredients with high levels of harmful heavy metals which are unsafe for babies.

56.    For example, regarding inorganic arsenic, Gerber's own testing showed that Gerber was routinely using rice flour that contained over 90 ppb of inorganic arsenic, even though there is no established safe level of arsenic for baby foods.  This is nearly 10 times more than the limit that the FDA has set for bottled water and that the EPA and WHO have set for drinking water.

57.    Regarding lead, Gerber's own limited lead testing showed ingredients, such as sweet potatoes, with as high as 48 ppb lead, even though there is no amount of lead in a child's blood which is considered safe.  Moreover, this is over 15 times the FDA's Interim Reference Level of 3 ppb of

lead for food consumed by children.

58.     As to cadmium, the Congressional Report showed that Gerber used ingredients containing as much as 87 ppb, far exceeding the 5ppb allowed by the FDA and EPA for bottled and drinking water.  Testing also showed that some products contained mercury.

59.     As the above testing shows, from 2017 to 2019 and possibly later, Gerber sold baby food products that had harmful levels of inorganic arsenic, lead, cadmium and/or mercury.  Third-party testing has also shown that numerous Gerber products, including Gerber Puffs, Gerber Melts, and other Gerber snacks contain excessively high amounts of inorganic arsenic, lead, cadmium and or mercury.[15]

60.     Despite touting itself as a family company that cares about babies and children and aims to provide nutritious and healthy foods, and conveying through statements on product labeling that the Gerber Products are safe and suitable for babies, Gerber sold baby food products that were unsafe for babies and also failed to warn and disclose material facts, including that its products contained harmful heavy metals, including inorganic arsenic, lead, cadmium, and/or mercury.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action on behalf of herself and on behalf of the following proposed Class initially defined as follows: All persons residing in the United States who purchased for personal, family, or household use, from 2017 to the present, one or more Gerber Products  ("National Class").

62.     Plaintiff also brings this action on behalf of herself and a Florida class defined as follows: All persons residing in Florida who purchased for personal, family, or household use, from 2017 to the present, one or more Gerber Products ("Florida Class").

63.     The National Class and Florida Class are collectively referred to herein as "Class" unless otherwise stated.

64.     Excluded from the proposed National and Florida Classes are Defendant, its parents,

---

[15] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

65.     Plaintiff reserves the right to re-define any of the Class definitions prior to class certification and after having the opportunity to conduct discovery.

66.     This action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

## Numerosity of the Proposed Class

### (Fed. R. Civ. P. 23(a)(1))

67.     The members of the Class are so numerous that their individual joinder would be impracticable. The Class comprises at least hundreds of thousands of consumers. The precise number of Class members, and their addresses, are unknown to Plaintiff at this time, but can be ascertained from Defendant's records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, supplemented (if deemed necessary or appropriate by the Court) by published notice.

## Predominance of Common Questions of Fact and Law

### (Fed. R. Civ. P. 23(a)(2); 23(b)(3))

68.     Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual members of the Class. The common legal and factual questions include, without limitation:

        (a)     Whether Defendant knew its products contained harmful heavy metals that rendered their baby food products unsafe for babies;

        (b)     Whether Defendant's affirmative representations about its products, when considered as a whole, were false and misleading to reasonable consumers because the products were unsafe for babies, contained harmful heavy metals as Defendant's internal testing showed, and because Defendant's internal policies permitted the sale of the products with harmful levels of heavy metals;

        (c)     Whether Defendant failed to warn and disclose material facts regarding its

products, namely, that they were unsafe for babies; that they contained heavy metals or the level of heavy metals; that the Defendant's testing showed that their products contained harmful heavy metals; and that the Defendant's policies permitted the sale of the products with harmful levels of heavy metals;

> (d)     Whether Defendant violated the state consumer protection statute alleged herein;

> (e)     Whether Defendant was unjustly enriched; and

> (f)     The nature of the relief, including damages and equitable relief, to which Plaintiff and the members of the Class are entitled.

### Typicality of Claims

### (Fed. R. Civ. P. 23(a)(3))

69.     Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other Class members, purchased Defendant's products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class members.

### Adequacy of Representation

### (Fed. R. Civ. P. 23(a)(4))

70.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class, and she has retained counsel competent and experienced in complex class action and consumer litigation.

71.     Plaintiff and her counsel will fairly and adequately protect the interest of the members of the Class.

### Superiority of a Class Action

### (Fed. R. Civ. P. 23(b)(3))

72.     A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and members of the Class.  There is no special interest in Class members individually controlling the prosecution of separate actions.  The damages suffered by individual members of the Class, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it

would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. And, even if members of the Class themselves could afford such individual litigation; the court system could not, given the thousands or even millions of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief

### (Fed. R. Civ. P. 23(b)(1) and (2))

73.    In the alternative, this action may properly be maintained as a class action, because:

(a)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendant; or

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c)    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

### Issue Certification

### (Fed. R. Civ. P. 23(c)(4))

74.    In the alternative, the common questions of fact and law, set forth in Paragraph 68, are appropriate for issue certification on behalf of the proposed Class.

## FIRST CAUSE OF ACTION

**Unjust Enrichment
(On Behalf of Plaintiff, the National Class,
and the Florida Class)**

75.     Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

76.     Plaintiff and Class members conferred benefits upon Defendant. Plaintiff and Class members paid money for the Gerber Products that were unsafe and not suitable for babies.  Defendant has unjustly retained the benefits conferred upon by Plaintiff and Class members.

77.     Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Specifically, Defendant retained those benefits even though the Gerber Products contain harmful heavy metals that render them unsafe and unsuitable for consumption by babies.  If Plaintiff and Class members had known the true nature of the Gerber Products, they would not have paid money for them or would have paid less.

78.     Plaintiff and Class members are therefore entitled to restitution, including non-restitutionary disgorgement of profits, as prayed for hereunder.

## SECOND CAUSE OF ACTION

**Fraud
(Concealment and Omissions)
(On Behalf of Plaintiff, the National Class, and the Florida Class)**

79.     Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

80.     Defendant made affirmative misrepresentations, partial-truths, and purposefully concealed the true facts on each package of the Gerber Products.  Defendant made these misrepresentations, partial truths to, and concealed the truth from, Plaintiff and Class members about the Gerber Products knowing that they contained harmful heavy metals, the level of heavy metals, or that internal policies permitted Defendant to sell products containing harmful heavy metals.

81.     Defendant's representations and partial truths were false. As a result of Defendant's false and misleading statements and deceptions, and omissions, Defendant achieved its desired

result—to sell products that they otherwise would not have or at higher prices.

82.    Defendant knew that its misrepresentations and omissions in this regard were false and/or misleading.  Defendant has been aware of the falsity and misleading nature of its affirmative misrepresentations and omissions for several years.

83.    Defendant had a duty to disclose the material facts alleged herein because it had exclusive and superior access to, and knowledge about, the levels of heavy metals in its foods and internal testing policies and limits.  Defendant also had a duty to disclose because it made affirmative representations to Plaintiff and Class members, and the general public about the nature, quality, and characteristics of the Gerber Products.  Specifically, Defendant affirmatively represented that the Gerber Products were suitable and safe for babies when it knew this was false and/or misleading.  This duty applied at the time Plaintiff and Class members purchased the Gerber Products, and it continues to apply today.

84.    Defendant intended for Plaintiff and Class members to rely on its misrepresentations and omissions.  Defendant engaged in this course of conduct to sell the Gerber Products in the United States market with disregard of the unsafe nature of the products for babies.  Defendant's acts were done wantonly, maliciously, oppressively, and deliberately, with the intent to defraud Plaintiff and Class members and with reckless and conscious disregard for Plaintiff's and Class members' rights.

85.    Defendant's misrepresentations, partial-truths, and omissions were material to Plaintiff's and Class members' decision to buy the Gerber Products.  Defendant was aware—and exploited—the fact that Plaintiff and Class members turned to them and trusted them to sell safe baby food and to disclose material facts.

86.    Plaintiff and Class members could not have discovered the truth about the Gerber Products as Defendant concealed these facts from the public until they were asked to comply with a congressional investigation and the Congressional Report became public.  Plaintiff and Class members could not have otherwise known of Defendant's scheme and ongoing deception.

87.    Plaintiff and Class members reasonably relied on the representations and omissions in purchasing the Gerber Products.  Had Defendant disclosed to Plaintiff and Class members the material facts alleged herein on the product packaging, Plaintiff and Class members would have seen such

disclosures as they relied on Defendant's representations.  Further, had Plaintiff and Class members known the truth about the Gerber Products and the true characteristics of the products, they would not have acted as they did.  Plaintiff and Class members would not have purchased the Gerber Products, or they would have paid less for such products.

88.     Plaintiff and Class members were injured by their reliance on Defendant's misrepresentations, partial-truths, and omissions.  Plaintiff and Class members have been damaged because they purchased products that were unsafe for babies and not as represented, and, because of that deception have been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### Violations of the Florida Unfair & Deceptive Trade Practices Act

### Fla. Stat. § 501.201, *et seq.*

### (On Behalf of Plaintiff and the Florida Class)

89.     Plaintiff hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

90.     Plaintiff and members of the Florida Class are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

91.     Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

92.     FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . .." Fla. Stat. § 501.204(1). Defendant participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

93.     In the course of business, Defendant made affirmative misrepresentations that conveyed to Plaintiff and Class members that the Gerber Products were safe and suitable for babies.  Defendant, however, concealed and suppressed material facts concerning the Gerber Products, including that the Gerber Products were unsafe and unsuitable for babies; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the Gerber products contained harmful heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy

metals.

94.     Plaintiff and Class members had no way of discerning that Defendant's representations were false and misleading because Class members did not have access to Defendant's internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

95.     Defendant thus violated the Act by making statements, when considered as a whole from the perspective of the reasonable consumer, that conveyed that the Gerber Products were safe and suitable for babies.  Defendant also failed to disclose and warn that the Gerber Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; and that Defendant's policies permitted the sale of products with harmful levels of heavy metals.

96.     Defendant intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the Gerber Products with intent to mislead Class members.

97.     Defendant knew or should have known that its conduct violated the FUDTPA.

98.     Defendant owed the Class a duty to disclose the true and unsafe nature of the Gerber Products.

99.     Defendant possessed exclusive knowledge that it was manufacturing, selling, and distributing the Gerber Products throughout the United States that was not as advertised.

100.     Defendant's concealment of the true characteristics of the Gerber Products was material to Class members.

101.     Defendant intentionally concealed the foregoing from regulators, Plaintiff, and Florida Class members; and/or made incomplete representations about the Gerber Products, while purposefully withholding material facts from Plaintiff and the Florida Class that contradicted these representations.

102.     Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and Class members, about the true nature of the Gerber Products.

103.     Defendant's violations present a continuing risk to Plaintiff and the Florida Class as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the

public interest.

104.    Plaintiff and the Florida Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and concealment of and failure to disclose material information. Defendant had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the FUDTPA.  Plaintiff and all Class members suffered ascertainable loss as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

105.    As a direct and proximate result of Defendant's violations of the FUDTPA, Plaintiff and members of the Florida Class have suffered injury-in-fact and/or actual damage.

106.    Plaintiff and the Florida Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

107.    Plaintiff and the Florida Class also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the proposed Class, prays for relief and judgment against Defendant as follows:

A.    Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

C.    Awarding Plaintiff and the Class appropriate relief, including actual and statutory damages;

D.    For punitive damages;

E.    For declaratory and equitable relief, including restitution and disgorgement;

F.    For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

G.      Awarding Plaintiff and the Class the costs of prosecuting this action, including expert witness fees;

H.      Awarding Plaintiff and the Class reasonable attorneys' fees and costs as allowable by law;

I.      Awarding pre-judgment and post-judgment interest; and

J.      Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 2, 2021

By: */s/ Steven J. Toll*
  Steven J. Toll (VSB No. 15300)
  Douglas J. McNamara (*pro hac vice* forthcoming)
  Geoffrey A. Graber (*pro hac vice* forthcoming)
  Brian E. Johnson (*pro hac vice* forthcoming)
  Paul M. Stephan (*pro hac vice* forthcoming)
  **COHEN MILSTEIN SELLERS & TOLL PLLC**
  1100 New York Ave. NW
  East Tower, 5th Floor
  Washington, DC  20005
  Telephone:  (202) 408-4600
  Facsimile:   (202) 408-4699
  stoll@cohenmilstein.com
  dmcnamara@cohenmilstein.com
  ggraber@cohenmilstein.com
  bejohnson@cohenmilstein.com
  pstephan@cohenmilstein.com

  Rosemary M. Rivas (*pro hac vice* forthcoming)
  Mark Troutman (*pro hac vice* forthcoming)
  Rosanne L. Mah (*pro hac vice* forthcoming)
  **GIBBS LAW GROUP LLP**
  505 14th Street, Suite 110
  Oakland, California 94612
  Telephone: (510) 350-9700
  Facsimile: (510) 350-9701
  rmr@classlawgroup.com

  *Attorneys for Plaintiff and the Proposed*
  *Class Members*